# UNITED STATES DISTRICT COURT
для the
Southern District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>Apple Inc. iCloud Account associated with (619) 530-4331, Apple IDs: espinozaemmanuel3@gmail.com and DS ID – 8393440809 | Case No. '24 MJ0898 |

**APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS**

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated herein by reference.

located in the __Northern__ District of __California__, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;
☑ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 841 and 846 | Possession with intent to distribute controlled substances and conspiracy related thereto |

The application is based on these facts:
See Affidavit of Special Agent Grant Carter, which is hereby incorporated by reference and made part hereof.

☑ Continued on the attached sheet.
☐ Delayed notice of ____ days *(give exact ending date if more than 30 days: _____)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Grant Carter, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by __telephone__ *(specify reliable electronic means)*.

Date: __03/05/2024__

_____
*Judge's signature*

City and state: San Diego, California    Hon. Michelle M. Pettit, U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF
# APPLICATION FOR A SEARCH WARRANT

I, Grant Carter, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION

1. I make this affidavit in support of an application for a search warrant for information associated with the following iCloud account that is stored at premises owned, maintained, controlled, and/or operated by Apple Inc. (Apple), an electronic communications service and/or remote computing service provider headquartered at One Apple Park Way, Cupertino, California:

> (619) 530-4331, Apple IDs: espinozaemmanuel3@gmail.com and DS ID – 8393440809, used by Emmanuel ESPINOZA-Gaxiola (the **Target Account**)[1]

as described further in Attachment A for items that constitute evidence, fruits, and instrumentalities of violations of federal criminal law, namely, possession of controlled substances with intent to distribute and conspiracy to do the same, in violation of Title 21, United States Code, Sections 841(a)(1) and 846, as described in Attachment B. This affidavit is made in support of an application for a search warrant under Title 18, United States Code, Sections 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require Apple to disclose to the United States copies of the information (including the content of communications) described in Section II of Attachment B. Upon receipt of the information, United States-authorized persons will review that information to locate the items described in Section III of Attachment B.

2. The facts set forth in this affidavit are based on my own personal knowledge; knowledge obtained from other individuals during my participation in this investigation,

---

[1] On February 13, 2024, investigators obtained records from Apple pursuant to a subpoena related to telephone number (619) 530-4331. The records revealed that the telephone number is associated with an Apple iCloud, *i.e.*, the **Target Account**. The records also reflected that the **Target Account** utilizes the following iCloud features: iCloud Backup (iOS Devices); Bookmarks; Calendars; iCloud Photos; Contacts; Find My Friends; iCloud Drive; Notes; and Sign-in with Apple. According to the data, the last iCloud back-up was on or about January 29, 2024, *i.e.*, the date of ESPINOZA's arrest. A preservation order was served upon Apple for the **Target Account**.

including other law enforcement officers who have personal knowledge of the events and circumstances described herein; my review of documents and reports related to this investigation; and information gained through my training and experience. Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the application for the search warrant, it does not set forth each and every fact that I or others have learned during the course of this investigation. Conversations are set forth below in substance unless noted. Dates, times, and amounts are approximate.

## **BACKGROUND AND EXPERIENCE**

3. I am a Special Agent of the DEA and have been so employed since March 2008. I am currently assigned to the DEA San Diego Field Division (SDFD) Narcotic Task Force (NTF) Team 2. I am an investigative or law enforcement officer within the meaning of Title 18, United States Code, Section 2510(7); that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

4. During my time with DEA, I have had formal training and experience in controlled substance investigations. I attended a 16-week training academy with the DEA to become a Special Agent in which I received formal training in conducting narcotics investigations, identifying controlled substances by sight, and becoming familiar with the manner in which controlled substances are packaged, marketed, transported, and consumed.

5. On the job, I have participated in multiple separate investigations involving the distribution of controlled substances. As part of these investigations, I have used various investigative techniques, including physical and stationary surveillance, informants and cooperating sources, pen register and trap and trace devices, telephone toll analysis, undercover operations, tracking warrants, search warrants, and electronic examinations of evidence. Through these investigations, my training, experience, and my conversations with other law enforcement investigators, I have become familiar with the methods used by narcotics traffickers to smuggle and safeguard narcotics, to distribute narcotics, and to

collect and launder proceeds related to the sales of narcotics. I also am familiar with the methods employed by narcotics organizations to thwart detection by law enforcement, including but not limited to the use of cellular telephone technology, counter surveillance techniques, false or fictitious identities and addresses, and coded communications. Through the totality of my training and experience, I have familiarized myself with the jargon, mannerisms, and methods employed by distributors of controlled substances.

6. Through the course of my training, investigations, and conversations with other law enforcement personnel, I am aware that it is a common practice for individuals involved in the distribution of controlled substances to work in concert with other individuals and to do so by utilizing cellular telephones and other portable communication devices to maintain communications with co-conspirators in order to further their illicit criminal activities. Drug traffickers often require the use of a telephone facility to negotiate times, places, schemes, and manners for importing, possessing, concealing, manufacturing, and distributing controlled substances and for arranging the disposition of proceeds from the sales of controlled substances. I know that professional drug operations depend upon maintaining their extensive contacts. The telephone enables drug traffickers to maintain contact with associates, suppliers, and customers. As such, those devices can store information about locations, including residences used as stash locations, homes of co-conspirators, storage lockers where supplies and related illicit items (such as firearms and cash proceeds) are kept, banks and ATM machines where illicit money-movement activity occurs, and public parking lots where drug deals may happen. They also can store, among others, messages referring to trafficking arrangements and the payment of monies related to trafficking, the names and contact information of co-conspirators, and photographs and/or videos reflecting drug-trafficking activity. I also know that drug traffickers often use coded language to obscure conversations about their unlawful activity because they believe coded language makes it more difficult to identify their conduct.

//

//

3

# JURISDICTION

7. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by Title 18, United States Code, Section 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

# PROBABLE CAUSE

### A. Facts Supporting Probable Cause

8. In April 2023, DEA SDFD NTF Team 2 investigators began investigating the drug-trafficking activities of Jaime TAICH-Cruz who was believed to distribute bulk-quantities of narcotics, including methamphetamine, to sub-distributors primarily from his apartment complex located at 1150 E St., San Diego, California (hereinafter, the Broadway Towers). During the investigation, ESPINOZA was identified as a co-conspirator.

9. On January 19, 2024, the grand jury returned an Indictment charging ESPINOZA with conspiracy to distribute methamphetamine, in violation of Title 21, United States Code, Sections 841(a)(1) and 846, and distribution of methamphetamine, in violation of Title 21, United States Code, Section 841(a)(1), and Title 18, United States Code, Section 2. An arrest warrant was issued on the same date.

10. On January 29, 2024, investigators conducting surveillance observed ESPINOZA arrive at an apartment complex located in San Diego, California, driving a vehicle registered to him. ESPINOZA was the only occupant of the vehicle. A San Diego Police Department Officer made contact with ESPINOZA and placed him under arrest pursuant to the federal arrest warrant. After the arrest, investigators located an iPhone sitting on the front driver's seat of ESPINOZA's vehicle and a second pink iPhone in the center console. Both were seized. However, the iPhone that had been found sitting on the front driver's seat of ESPINOZA's vehicle was inadvertently left sitting on the hood of the Officer's vehicle and lost when the Officer drove away. Investigators now seek permission

to search the iCloud account, *i.e.*, the **Target Account**, associated with what they suspect to be the lost device for the reasons stated herein.[2]

**B.    ESPINOZA Coordinated Drug-Trafficking Activities with TAICH Via a Telephone Associated with the Target Account**

11.    On July 24, 2023, investigators conducted surveillance outside the Broadway Towers. At approximately 2:52 p.m., investigators observed ESPINOZA and TAICH arrive in a vehicle registered to ESPINOZA. Investigators then saw them enter the Broadway Towers. ESPINOZA (in grey) was carrying a flat, unassembled cardboard box.



12.    Approximately 30 minutes later, ESPINOZA exited the Broadway Towers alone carrying an assembled cardboard box which, based on the color and size, appeared to be the same unassembled box that ESPINOZA had carried into the Broadway Towers with TAICH. ESPINOZA placed the box inside the rear passenger compartment of his vehicle and drove away. According to footage obtained from the Broadway Towers, during the 30 minutes that ESPINOZA and TAICH were inside the Broadway Towers, ESPINOZA and TAICH exited the elevator with the unassembled box onto the floor where ESPINOZA lived. They then returned to the elevator where ESPINOZA was observed still

---

[2]    Investigators have confirmed that the pink iPhone does not bear the telephone number associated with the **Target Account**. Also, as stated above, the **Target Account** was last backed-up on the date of ESPINOZA's arrest, reinforcing investigators' view that the **Target Account** is associated with the lost iPhone. However, even if the lost iPhone is not associated with the **Target Account**, investigators nevertheless believe that probable cause has been established to search the **Target Account** for the reasons stated herein.

carrying the unassembled box but now also appeared to have a roll of packing tape wrapped around his wrist and to be carrying a piece of paper. They then traveled together to the 31st floor where TAICH's apartment was located. After a period of time, ESPINOZA was observed alone re-entering the elevator with the box now assembled, sealed, and addressed.



13. ESPINOZA then got off on his floor briefly before reentering the elevator with the box, going to the lobby, exiting the building, and entering his vehicle.

14. Investigators followed as ESPINOZA arrived at the Postal Annex+, 2307 Fenton Parkway, Suite 107, San Diego, California. Investigators subsequently detained the cardboard box that ESPINOZA attempted to mail and obtained a federal search warrant for it. Packages weighing approximately 12 pounds and containing a white, crystalline substance were discovered inside. Of the 5.37 net kilograms tested, 3.76 kilograms subsequently were determined to be pure methamphetamine by the DEA laboratory.

15. Toll records reflected TAICH[3] was in frequent contact with telephone number (619) 530-4331, *i.e.*, the telephone number associated with the **Target Account**, during/immediately after the shipping of the cardboard box. Lease documents for ESPINOZA provided by the Broadway Towers have identified telephone number (619) 530-4331 as belonging to him. Moreover, during an interview with ESPINOZA's mother on or about January 30, 2024, investigators confirmed his telephone number as (619) 530-

---

[3] During the investigation, TAICH identified his telephone number to an undercover investigator (UC).

6

4331. For his role in connection with this seizure, ESPINOZA has been charged by the grand jury with distribution of methamphetamine, in violation of Title 21, United States Code, Section 841(a)(1), and Title 18, United States Code, Section 2.

C.     **Background Concerning Apple**

16.     Apple is a United States company that produces the iPhone, iPad, and iPod Touch, all of which use the iOS operating system, and desktop and laptop computers based on the Mac OS operating system.

17.     Apple provides a variety of services that can be accessed from Apple devices or, in some cases, other devices via web-browsers or mobile and desktop applications (apps). As described in further detail below, the services include email, instant messaging, and file storage:

   a.     Apple provides email service to its users through email addresses at the domain names mac.com, me.com, and icloud.com.

   b.     iMessage and FaceTime allow users of Apple devices to communicate in real-time. iMessage enables users of Apple devices to exchange instant messages (iMessages) containing text, photos, videos, locations, and contacts, while FaceTime enables those users to conduct audio and video calls.

   c.     iCloud is a cloud storage and cloud computing service from Apple that allows its users to interact with Apple's servers to utilize iCloud-connected services to create, store, access, share, and synchronize data on Apple devices or via icloud.com on any Internet-connected device. For example, iCloud Mail enables a user to access Apple-provided email accounts on multiple Apple devices and on iCloud.com. iCloud Photo Library and My Photo Stream can be used to store and manage images and videos taken from Apple devices, and iCloud Photo Sharing allows the user to share those images and videos with other Apple subscribers. iCloud Drive can be used to store presentations, spreadsheets, and other documents. iCloud Tabs and bookmarks enable iCloud to be used to synchronize bookmarks and webpages opened in the Safari web browsers on all of the

user's Apple devices. iCloud Backup allows users to create a backup of their device data.[4] iWork Apps, a suite of productivity apps (Pages, Numbers, Keynote, and Notes), enables iCloud to be used to create, store, and share documents, spreadsheets, and presentations. iCloud Keychain enables a user to keep website username and passwords, credit card information, and Wi-Fi network information synchronized across multiple Apple devices.

      d.    Game Center, Apple's social gaming network, allows users of Apple devices to play and share games with each other.

      e.    Find My iPhone allows owners of Apple devices to remotely identify and track the location of, display a message on, and wipe the contents of those devices. Find My Friends allows owners of Apple devices to share locations.

      f.    Location Services allows apps and websites to use information from cellular, Wi-Fi, Global Positioning System (GPS) networks, and Bluetooth, to determine a user's approximate location.

      g.    App Store and iTunes Store are used to purchase and download digital content. iOS apps can be purchased and downloaded through App Store on iOS devices, or through iTunes Store on desktop and laptop computers running either Microsoft Windows or Mac OS. Additional digital content, including music, movies, and television shows, can be purchased through iTunes Store on iOS devices and on desktop and laptop computers running either Microsoft Windows or Mac OS.

18. Apple services are accessed through the use of an "Apple ID," an account created during the setup of an Apple device or through the iTunes or iCloud services. The account identifier for an Apple ID is an email address, provided by the user. Users can submit an Apple-provided email address (often ending in @icloud.com, @me.com, or @mac.com) or an email address associated with a third-party email provider (such as Gmail, Yahoo, or Hotmail). The Apple ID can be used to access most Apple services (including iCloud, iMessage, and FaceTime) only after the user accesses and responds to a

---

[4] As stated above, records provided by Apple reflect that the **Target Account** utilizes iCloud Backup.

8

"verification email" sent by Apple to that "primary" email address. Additional email addresses ("alternate," "rescue," and "notification" email addresses) can also be associated with an Apple ID by the user. A single Apple ID can be linked to multiple Apple services and devices, serving as a central authentication and syncing mechanism.

19.  Apple captures information associated with the creation and use of an Apple ID. During the creation of an Apple ID, the user must provide basic personal information including the user's full name, physical address, and telephone number(s). The user may also provide means of payment for products offered by Apple. The subscriber information and password associated with an Apple ID can be changed by the user through the "My Apple ID" and "iForgot" pages on Apple's website. In addition, Apple captures the date on which the account was created, the length of service, records of log-in times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to and utilize the account, the Internet Protocol address (IP address) used to register and access the account, and other log files that reflect usage of the account.

20.  Additional information is captured by Apple in connection with the use of an Apple ID to access certain services. For example, Apple maintains connection logs with IP addresses that reflect a user's sign-on activity for Apple services such as iTunes Store and App Store, iCloud, Game Center, and the My Apple ID and iForgot pages on Apple's website. Apple also maintains records reflecting a user's app purchases from App Store and iTunes Store, "call invitation logs" for FaceTime calls, "query logs" for iMessage, and "mail logs" for activity over an Apple-provided email account. Records relating to the use of the Find My iPhone service, including connection logs and requests to remotely lock or erase a device, are also maintained by Apple.

21.  Apple also maintains information about the devices associated with an Apple ID. When a user activates or upgrades an iOS device, Apple captures and retains the user's IP address and identifiers such as the Integrated Circuit Card ID number (ICCID), which is the serial number of the device's SIM card. Similarly, the telephone number of a user's

iPhone is linked to an Apple ID when the user signs into FaceTime or iMessage. Apple also may maintain records of other device identifiers, including the Media Access Control address (MAC address), the unique device identifier (UDID), and the serial number. In addition, information about a user's computer is captured when iTunes is used on that computer to play content associated with an Apple ID, and information about a user's web browser may be captured when used to access services through icloud.com and apple.com. Apple also retains records related to communications between users and Apple customer service, including communications regarding a particular Apple device or service, and the repair history for a device.

22. Apple provides users with five gigabytes of free electronic space on iCloud, and users can purchase additional storage space. That storage space, located on servers controlled by Apple, may contain data associated with the use of iCloud-connected services, including email (iCloud Mail); images and videos (iCloud Photo Library, My Photo Stream, and iCloud Photo Sharing); documents, spreadsheets, presentations, and other files (iWork and iCloud Drive); and web browser settings and Wi-Fi network information (iCloud Tabs and iCloud Keychain). iCloud can also be used to store iOS device backups, which can contain a user's photos and videos, iMessages, Short Message Service (SMS) and Multimedia Messaging Service (MMS) messages, voicemail messages, call history, contacts, calendar events, reminders, notes, app data and settings, Apple Watch backups, and other data. Records and data associated with third-party apps may also be stored on iCloud; for example, the iOS app for WhatsApp, an instant messaging service, can be configured to regularly back up a user's instant messages on iCloud Drive. Some of this data is stored on Apple's servers in an encrypted form but can nonetheless be decrypted by Apple.

## **ITEMS TO BE SEIZED**

23. Investigators know that individuals working with criminal organizations often use multiple communication platforms in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation. Indeed, based on training and

experience, investigators are aware that, in addition to telephone and text messaging services (*i.e.*, MMS and SMS), other communication platforms, like iMessage and WhatsApp, are also often used by drug traffickers to engage in their illegal activity. These communication services can be used to coordinate payments and meetings, conduct negotiations and other matters relating to the criminal scheme, and to send location data, photographs, audio files, and/or videos, concerning the criminal activity, all of which are available from iCloud as outlined above. Based on my training and experience, voicemails, audio files, photographs, videos, and documents also are often created and used in furtherance of criminal activity. Thus, stored communications and files connected to the **Target Account** may provide direct evidence of the offenses under investigation. This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

24. Based on training and experience, investigators are aware that evidence of who was using an Apple ID and from where, and evidence related to criminal activity of the kind at issue here, may be found in the files and records described in Attachment B and available from iCloud. For example, account activity may provide relevant insight into an account owner's state of mind as it relates to the offenses under investigation, such as the owner's motive and intent to commit a crime (*e.g.*, communications indicating a plan to commit a crime) or consciousness of guilt (*e.g.*, deleting account information in an effort to conceal evidence from law enforcement). Communications, notes, contacts, and other information that Apple can produce related to the **Target Account**, such as location data, also can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation, including addresses and/or vehicles used by the subjects of the investigation. And, the identification of apps downloaded from App Store and iTunes Store may reveal services used in furtherance of the crimes under investigation, such as services used to communicate with co-conspirators. Therefore, Apple's servers are likely to contain

stored electronic communications and information constituting evidence of the crimes under investigation.

25. Apple's servers also are likely to contain "user attribution" evidence. Such evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, device information, the data associated with the foregoing (such as geo-location, date, and time information), photographs, videos, and audio files may be evidence of who used or controlled the **Target Account** at a relevant time. As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices – and thereby which user(s) – likely accessed the **Target Account**. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crimes under investigation.

### **PROCEDURES FOR ELECTRONICALLY STORED INFORMATION**

26. Federal agents and investigative support personnel are trained and experienced in identifying communications relevant to the crimes under investigation. The personnel of Apple are not. It would be inappropriate and impractical for federal agents to search the vast computer network of Apple for the relevant account and then to analyze the contents of that account on the premises of Apple. The impact on Apple's business would be severe.

27. Therefore, I request authority to seize all content from the **Target Account**, as described in Attachment B. In order to accomplish the objective of the search warrant with a minimum of interference with the business activities of Apple, to protect the rights of the subject(s) of the investigation, and to effectively pursue this investigation, authority is sought to allow Apple to make a digital copy of the entire contents of the account subject to seizure, as described in Section II of Attachment B. The copy will be provided to me or to any authorized federal investigator. The copy will be forensically imaged, and the images will then be analyzed to identify communications and other data subject to seizure

pursuant to Section III of Attachment B. Relevant data will be copied to separate media. The original media will be sealed and maintained to establish authenticity, if necessary.

28. Analyzing the data to be provided by Apple may require special technical skills, equipment, and software. It also can be very time-consuming. Searching by keywords, for example, often yields many thousands of "hits," each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant. Merely finding a relevant "hit" does not end the review process. Certain file formats do not lend themselves to keyword searches. Keywords search text. Many common applications do not store data as searchable text. The data may be saved in a proprietary non-text format. And, as the volume of storage allotted by service providers increases, the time it takes to properly analyze recovered data increases dramatically.

29. Based on the foregoing, searching the recovered data for the information subject to seizure pursuant to these warrants may require a range of data analysis techniques and may take weeks or even months. Keywords need to be modified continuously based upon the results obtained. The personnel conducting the examination will complete the analysis within ninety (90) days of receipt of the data from the service provider, absent further application to this Court.

30. All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification and extraction of data within the scope of the warrant. Based on training and experience, drug traffickers who domestically traffic large amounts of narcotics for sale, such as ESPINOZA, often have worked in drug trafficking for an extended period of time in order to be trusted to mail such large amounts of narcotics and/or purchase such large amounts of narcotics and to develop a sufficient client base for resale. As such, this search warrant seeks all materials from Apple for the **Target Account** for the time-period from July 1, 2023 (less than a month prior to the seizure of the cardboard box

containing the methamphetamine packages, discussed above), up to and including January 30, 2024 (the day after ESPINOZA's arrest).[5]

## CONCLUSION

31. Based on the forgoing, I request that the Court issue the proposed warrant.

*[signature]*

Special Agent Grant Carter
Drug Enforcement Administration

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 5th day of March 2024.

*[signature]*

HONORABLE MICHELLE M. PETTIT
UNITED STATED MAGISTRATE JUDGE

---

[5] Investigators know that co-conspirators are often unaware of a co-conspirator's arrest and will continue to attempt to communicate with a co-conspirator after his/her arrest.

14

## ATTACHMENT A
## PROPERTY TO BE SEARCHED

This warrant applies to information associated with (619) 530-4331, Apple IDs: espinozaemmanuel3@gmail.com and DS ID – 8393440809 (the **Target Account**), an Apple Inc. iCloud account that is stored at premises owned, maintained, controlled, and/or operated by Apple Inc. (Apple), an electronic communications service and/or remote computing service provider headquartered at One Apple Park Way, Cupertino, California.

# ATTACHMENT B
# ITEMS TO BE SEIZED

I.    **Service of Warrant**

The officer executing the warrant shall permit Apple Inc. (Apple), as custodian of the files described in Section II below, to locate the files and copy them onto removable electronic storage media and deliver the same to the officer.

II.    **Information to be Disclosed by Apple**

To the extent that the information is within the possession, custody, or control of Apple, regardless of whether such information is located within or outside of the United States, and including any emails, records, files, logs, or information that has been deleted but is still available to Apple, or has been preserved pursuant to a request made under Title 18, United States Code, Section 2703(f), Apple is required to disclose to the United States for the account listed in Attachment A the following information from July 1, 2023, until January 30, 2024, unless otherwise indicated:

    A.    All subscriber and user information pertaining to the **Target Account**, in any form kept, including:

        1.    All identity information, including full name, physical address(es), telephone number(s), email address(es) (including primary, alternate, rescue, and notification email address(es), and verification information for each email address), the IP address used to register the **Target Account**, methods of connecting, means and source of payment (including any credit or bank account numbers), and information related thereto, including the date on which the **Target Account** was created and the length of service;

        2.    All device(s) associated with or used in connection with the **Target Account** and all device identifiers related thereto, including all current and past trusted or authorized iOS devices and computers, serial numbers, Unique Device Identifiers (UDID), Advertising Identifiers (IDFA), Global Unique Identifiers (GUID), Media Access Control (MAC) addresses, Integrated Circuit Card ID numbers (ICCID), Electronic Serial Numbers (ESN), Mobile Electronic Identity Numbers (MEIN),

        Mobile Equipment Identifiers (MEID), Mobile Identification Numbers (MIN), Subscriber Identity Modules (SIM), Mobile Subscriber Integrated Services Digital Network Numbers (MSISDN), International Mobile Subscriber Identities (IMSI), and International Mobile Station Equipment Identities (IMEI);

    3. All records and information regarding locations where the **Target Account** or device(s) associated with the **Target Account** were accessed, including all data stored in connection with Location Services, Find My iPhone, Find My Friends, and Apple Maps; and,

    4. All records pertaining to communications between Apple and any person regarding the **Target Account**, including contacts with support services and records of actions taken.

B. All records pertaining to the types of service(s) used by the **Target Account**;

C. All activity, connection, and transactional logs for the **Target Account** (with associated IP addresses including source port numbers), including FaceTime call invitation logs, messaging and query logs (including iMessage, SMS, and MMS messages), iCloud logs, iTunes Store and App Store logs (including purchases, downloads, and updates of Apple and third-party apps), My Apple ID logs, and sign-on logs for all Apple services;

D. The contents of all instant messages associated with the **Target Account**, including stored or preserved copies of instant messages (including iMessages, SMS messages, and MMS messages) sent to and from the **Target Account** (including all draft and deleted messages), the source and destination account or phone number associated with each instant message, the date and time at which each instant message was sent, the size and length of each instant message, the actual IP addresses of the sender and the recipient of each instant message, and the media, if any, attached to each instant message;

E. The contents of the **Target Account** stored on iCloud, limited to the following:

        1. All voicemails and audio files;

        2. All images and videos, including those available on iCloud Photo Sharing, My Photo Stream, and iCloud Photo Library;

        3. The content of all applications, including those in iCloud Backup and/or iCloud Drive, capable of being used to communicate with others, including but not limited to Instagram, Facebook, and WhatsApp;

        4. All address books, contact, and buddy lists; and,

        5. All notes.

F. All files, keys, or other information necessary to decrypt any data produced in an encrypted form pertaining to the **Target Account**, when available to Apple (including, but not limited to, the keybag.txt and fileinfolist.txt files).

## III. Information to be Seized by the United States

All information described above in Section II that constitutes evidence, fruits, and instrumentalities of violations of federal criminal law, namely, possession of controlled substances with intent to distribute and conspiracy to do the same, in violation of Title 21, United States Code, Sections 841(a)(1) and 846, those violations involving the user(s) of the **Target Account**, including information pertaining to the following matters:

A. Electronic records, such as communications, photographs, audio files, videos, and location data, tending to indicate efforts to distribute and/or import federally controlled substances;

B. Evidence indicating how and when the **Target Account** was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crimes under investigation and to the owner(s) of the **Target Account**;

C. Evidence indicating the state of mind of the owner(s) of the **Target Account** as it relates to the crimes under investigation;

D. The identity of the person(s) who created or used the **Target Account**, including but not limited to records that help reveal the whereabouts of such person(s), including but not limited to their travel to or presence at locations involved in the crimes under investigation, such as stash houses, load locations, or delivery points; and,

E. The identity of the person(s) who communicated with the **Target Account** about matters relating to the crimes under investigation, including records that help reveal their whereabouts.